COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                        NO.
2-06-280-CR

 

 

JODIE MOORE                                                                    APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

        FROM
CRIMINAL DISTRICT COURT NO. 2 OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

In five issues, appellant
Jodie Moore appeals his conviction for aggravated robbery with a deadly weapon.[2]  We affirm.

BACKGROUND








The State charged Appellant
with committing the aggravated robbery of Jaime Hernandez.  He pled not guilty.  During the guilt-innocence phase, the jury
heard testimony that Appellant and three other young black men stole Jaime=s necklace, ring, and wallet, as well as equipment belonging to Jaime=s employer, Rene Cadena, at gunpoint, from the construction site where
Jaime and his co-worker, Angel Hernandez, were working.[3]  Jaime identified Appellant from a photo
lineup on the day of the robbery but was unable to identify Appellant at
trial.  Rene testified that he saw his
equipment being unloaded by four young black men at a nearby pawn shop and
summoned the police.  Rene identified
Appellant in court as one of the four men at the pawn shop.  Juan Rodriguez, the pawn shop employee,
picked Appellant out of the photo lineup presented to him a few days after the
offense.








Appellant requested a charge
on the lesser‑included offense of theft. 
See Tex. Penal Code Ann. ' 31.03(b)(2) (Vernon Supp. 2006).  The trial court denied his request, and the
jury found Appellant guilty of aggravated robbery with a deadly weapon.  During the punishment phase, the jury heard
testimony from, among others, Donald Martin, who identified Appellant from the
same photo lineup presented to Jaime as the man who stole his van the day
before the robbery.  The jury assessed
Appellant=s punishment
at forty‑five years=
confinement.  The trial court rendered
judgment on the verdict and sentenced Appellant accordingly.

SUPPRESSION

In his second and fourth
issues, Appellant argues that the trial court erred by denying his motions to
suppress photo lineup identifications of him by Jaime in the guilt-innocence
phase and by Donald Martin in the punishment phase.  He moved to suppress both lineups before
trial, complaining that the identification process in each was impermissibly
suggestive.

Standard Of Review








We review a trial court=s ruling on a motion to suppress evidence under a bifurcated standard
of review.  Carmouche v. State, 10
S.W.3d 323, 327 (Tex. Crim. App. 2000); Guzman v. State, 955 S.W.2d 85,
89 (Tex. Crim. App. 1997).  In reviewing
the trial court=s decision,
we do not engage in our own factual review. 
Romero v. State, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); Best
v. State, 118 S.W.3d 857, 861 (Tex. App.CFort Worth 2003, no pet.).  The
trial judge is the sole trier of fact and judge of the credibility of the
witnesses and the weight to be given their testimony.  State v. Ross, 32 S.W.3d 853, 855
(Tex. Crim. App. 2000); State v. Ballard, 987 S.W.2d 889, 891 (Tex.
Crim. App. 1999).  Therefore, we give
almost total deference to the trial court=s rulings on (1) questions of historical fact, even if the trial court=s determination of those facts was not based on an evaluation of
credibility and demeanor, and (2) application‑of‑law‑to‑fact
questions that turn on an evaluation of credibility and demeanor.  Montanez v. State, 195 S.W.3d 101, 108‑09
(Tex. Crim. App. 2006); Johnson v. State, 68 S.W.3d 644, 652‑53
(Tex. Crim. App. 2002); State v. Ballman, 157 S.W.3d 65, 68 (Tex. App.CFort Worth 2004, pet. ref=d).  But when the trial court=s rulings do not turn on the credibility and demeanor of the
witnesses, we review de novo a trial court=s rulings on mixed questions of law and fact.  Estrada v. State, 154 S.W.3d 604, 607
(Tex. Crim. App. 2005); Johnson, 68 S.W.3d at 652‑53.

Stated another way, when
reviewing the trial court=s ruling on
a motion to suppress, we must view the evidence in the light most favorable to
the trial court=s
ruling.  Kelly v. State, 204
S.W.3d 808, 818 (Tex. Crim. App. 2006). 
When the trial court makes explicit fact findings, we determine whether
the evidence, when viewed in the light most favorable to the trial court=s ruling, supports those fact findings.  Id. at 818‑19.  We then review the trial court=s legal ruling de novo unless its explicit fact findings that are
supported by the record are also dispositive of the legal ruling.  Id. at 819.

Photographic Identification








A pretrial identification
procedure may be so suggestive and conducive to mistaken identification that
subsequent use of that identification at trial would deny the accused due
process of law.  See Simmons v. United
States, 390 U.S. 377, 384, 88 S. Ct. 967, 971 (1968); Barley v. State,
906 S.W.2d 27, 32‑33 (Tex. Crim. App. 1995), cert. denied, 516
U.S. 1176 (1996); Stewart v. State, 198 S.W.3d 60, 62 (Tex. App.CFort Worth 2006, no pet.).  We
apply a two‑step analysis in order to determine the admissibility of an
in‑court identification: (1) whether the pretrial identification
procedure was impermissibly suggestive and, if so, (2) whether the suggestive
procedure gave rise to a very substantial likelihood of irreparable misidentification.
 See Ibarra v. State, 11 S.W.3d
189, 195 (Tex. Crim. App. 1999), cert. denied, 531 U.S. 828 (2000); Loserth
v. State, 963 S.W.2d 770, 771-72 (Tex. Crim. App. 1998); Barley, 906
S.W.2d at 33; Stewart, 198 S.W.3d at 62. 
If the pretrial identification was impermissibly suggestive, the court
will then consider the five factors enumerated in Neil v. Biggers to
determine whether the impermissibly suggestive procedure gave rise to a
substantial likelihood of irreparable misidentification.[4]  409 U.S. 188, 199-200, 93 S. Ct. 375, 382
(1972). 








The first part of the
analysis requires an examination of the totality of the circumstances
surrounding the identification to determine if the procedure was unnecessarily
suggestive.  Barley, 906 S.W.2d at
33; Webb v. State, 760 S.W.2d 263, 269 (Tex. Crim. App. 1988), cert.
denied, 491 U.S. 910 (1989).  The
defendant bears the burden of establishing by clear and convincing evidence
that the pretrial identification procedure was impermissibly suggestive.  Barley, 906 S.W.2d at 33-34.  Suggestiveness may be created by the manner
in which the pretrial identification procedure is conducted.  Id. at 33; Page v. State, 125
S.W.3d 640, 647 (Tex. App.CHouston [1st Dist.] 2003, pet. ref=d).  Examples of this include
police pointing out the suspect or suggesting that a suspect is included in the
photo lineup.  Page, 125 S.W.3d at
647.

Jaime=s Identification

The trial court denied
Appellant=s motion to
suppress after a hearing, making the following findings:[5]









[Jaime]
was shown a [photo lineup].  The officer
asked him if he recognized anybody in there. 
He said that it only took him 40 seconds or so to pick out the person
that he did recognize; that this happened approximately four to five hours
after he had been held up; and that the officer did not suggest to him any
particular person to pick out; and told him though to make sure that he took
his time and looked at the [photo lineup] before he made his choice, which he
did.  So based upon all of that, I=m
going to deny the Motion to Suppress the [photo lineup].

 

Presentation Of The Photo Lineup








In part of his second issue,
Appellant contends that Jaime knew about the pawnshop and that the police had
made some arrests, so that it was reasonable for Jaime to assume that at least
one of the arrested suspects would be in the photo lineup and that Jaime did
make that assumption.

At the beginning of the
suppression hearing, Jaime said he was nervous, and his disjointed testimony
reflects both this and his difficulty understanding the questions and how to
respond.[6]  When asked whether the police told him that
they had arrested someone, Jaime testified that he thought the detective said
that Athey didn=t have them
or they didn=t got them
yet, something like that.@  Defense counsel summarized, asking, ATold you, no arrests are made yet?@  Jaime agreed, AYeah.@  He testified that he asked the detective
whether they had arrested the robbers at the pawn shop and that the detective
told him that they caught them but let them go. 
He testified that the detective did not say anything else before showing
him the photo lineup and that the police did not tell him that the person who
committed the crime would be in the photo lineup, but that it was his
impression that the person was in there.








The case law focuses on
actions by the police that create an atmosphere of impermissible
suggestion.  See Barley, 906
S.W.2d at 33; Page, 125 S.W.3d at 647. 
The testimony at the hearing reflects the trial court=s fact findings in that Jaime testified that the detective came to his
work site on the afternoon of the robbery and did not suggest to him any
particular person to pick out, but merely showed him the photo lineup and asked
if he recognized anyone.[7]  He also gave Jaime some very general
responses to Jaime=s questions
about whether anyone had been arrested. 
We conclude that, under the totality of the circumstances, the detective=s action in showing the photo lineup to Jaime was not impermissibly
suggestive, and we overrule this portion of Appellant=s second issue.

Preservation Of Error

In the remaining part of his
second issue, Appellant argues that the photo lineup was impermissibly
suggestive because Jaime described one of the suspects as wearing a dark shirt
but did not describe anyone as having a pigtail and Appellant was the only
person in the lineup with a dark shirt without a pigtail.  Appellant did not present this argument to
the trial court during the suppression hearing and did not raise it in his
general motion to suppress.








To preserve a complaint for
our review, a party must have presented to the trial court a timely request,
objection, or motion that states the specific grounds for the desired ruling if
they are not apparent from the context of the request, objection, or
motion.  Tex. R. App. P. 33.1(a)(1); Mosley
v. State, 983 S.W.2d 249, 265 (Tex. Crim. App. 1998) (op. on reh=g), cert. denied, 526 U.S. 1070 (1999).  Further, the trial court must have ruled on
the request, objection, or motion, either expressly or implicitly, or the
complaining party must have objected to the trial court=s refusal to rule.  Tex. R. App. P. 33.1(a)(2); Mendez
v. State, 138 S.W.3d 334, 341 (Tex. Crim. App. 2004).  Because Appellant did not present this
argument to the trial court, he has not preserved it for our review.  We overrule the remainder of Appellant=s second issue.

Donald=s Identification

In part of his fourth issue,
Appellant complains that Donald was aware that the robbers who stole his van
had been caught and that he inferred that the robber was in the photo lineup,
making it impermissibly suggestive.  The
trial court conducted a hearing on Appellant=s motion to suppress Donald=s identification during the punishment phase and denied it without
making any findings of fact or conclusions of law.

Presentation of the Photo Lineup








During the suppression
hearing, Donald testified that his van was stolen at gunpoint during the
evening of August 11, 2004, after he returned home from work.  He testified that he had just closed the
front door when the doorbell rang; he opened the door and a man with a gun
ordered Donald to give him his keys. 
Donald testified that he handed his keys to the man, the man drove off
with the van, and that a second vehicle, a dark‑colored Lincoln Towncar,
was driving in front of the van in a manner that made him believe that the
Towncar and van thief were together.[8]  He testified that he reported the theft and
described the man to the police as a black man wearing dark pants, with short
hair, of larger build than Donald.[9]  The next day, a detective came to his house
to show him two photo lineups, one of which was Exhibit 26, the same photo
lineup as Exhibit 10, and Donald picked out the fifth photo in one of the
lineupsCthe photo of Appellant.








 Donald testified that the detective did not
suggest to him that there was a suspect in the photo lineups.  He did testify that the detective, Asaid something to the effect of, they have several pictures of people
and I was supposed to choose one out of the group of pictures,@ but that the detective did not point to any particular
photograph.  He also testified that the
detective said, Ato look for
someone that could fit the description of what [Donald] remember[ed].@  Donald testified that he did
know that there were people under arrest for the crime when he looked at the
photo lineups and that after he picked out the person in one of the photo
lineups, the detective told him Athis person was one of theChowever many there were, that were picked up from another crime
committed.@

Detective Manny Reyes of the
Fort Worth police department, who showed the photo lineups to Donald, testified
that he took the two photo lineups compiled by Detective Johnson on August
12.  Detective Reyes testified that he
did not tell Donald that he was coming out to his house to show him photographs
and described his technique generally and in the context of the visit as:








I just ask, pick the photo of
someone you recognize or something like that. 
Actually, what I do, I just hand it to him and say, look, here is [sic]
some photos, take a look, see if you recognize anyone.  He looked at it.  He saw number five.  He looked at it.  He says,[A]that=s him right
here.[A] I said, [A]initial the
picture you are talking about.[A]  And he did.  He put his initials.  And I said, thank you.  I take [the photo lineup] back.  Everything else is blank.  I don=t fill anything out there. 
Everything else is blank except for the initials under number five.  I take that, I show him [the other photo
lineup].  The other one he said, Anobody here.@  I take that away, pull out my tape recorder
and I said, AI need to
get what happened to you yesterday.@  Push the start button and I
start talking, introduce myself.  And
that is all I do.

Detective Reyes also testified that he would not
have told Donald that they had anybody in custody.

As discussed above, the law
pertaining to photo lineups focuses on actions by police officers that create
an atmosphere of impermissible suggestion. 
See Barley, 906 S.W.2d at 33; Page, 125 S.W.3d at
647.  Other than Donald=s testimony that he knew there were people under arrest when he looked
at the photo lineups,[10]
but with no explanation of how he knew, and that Detective Reyes told him after
he picked out Appellant=s photo that
Appellant was someone who had been picked up for a different crime, there were
no major inconsistencies between Detective Reyes= testimony and Donald=s.








The trial court had the duty
to reconcile their testimony, as the sole judge of the witnesses= credibility and the weight to be given their testimony.  Reviewing these facts in the light most
favorable to the trial court=s ruling, we conclude that the trial court did not err by denying
Appellant=s motion to
suppress Donald=s
out-of-court identification because, based on the record and how the trial
court interpreted the conflicts in Donald and Detective Reyes= testimony, there was nothing impermissibly suggestive about Detective
Reyes= presentation.  See Kelly,
204 S.W.3d at 818; Ross, 32 S.W.3d at 855.  We overrule this portion of Appellant=s fourth issue.

In-court Identification

In the other part of his
fourth issue, Appellant complains that, because Donald Aopenly admitted he reviewed his identification in the photo lineup
shortly before trial,@ his in‑court
identification was also based upon the impermissibly suggestive photo lineup.








Unless it is shown by clear
and convincing evidence that an in‑court identification of a defendant
was tainted by improper pretrial identification procedures, the identification
will generally be considered admissible. See Bruton v. State, 921 S.W.2d
531, 534 (Tex. App.CFort Worth
1996, pet. ref=d).  As discussed above, the trial court did not
err by concluding that Donald=s pretrial identification of Appellant in the photo lineup was
proper.  See id.

For an in‑court
identification to be reliable, the record must clearly reflect that the witness=s observation of the accused during the offense was sufficient to
serve as an independent origin for the in‑court identification.  Id. at 534‑35; see also Clay
v. State, 518 S.W.2d 550, 554 (Tex. Crim. App. 1975).  In determining reliability, the totality of
the circumstances must be reviewed, and the following factors considered: (1)
the opportunity of the witness to view the criminal at the time of the crime,
(2) the witness=s degree of
attention, (3) the accuracy of the witness=s description of the criminal, (4) the witness=s level of certainty, and (5) the length of time between the crime and
the confrontation.  Bruton, 921
S.W.2d at 534.








Donald identified Appellant
in court as the armed man who stepped into his house and demanded the keys to
his van.  He testified that Appellant was
approximately a foot away from him when Appellant came inside Donald=s house and pointed his gun at Donald=s stomach.  He described
Appellant as being Donald=s height or
taller, described some of Appellant=s clothes the night of the robbery, and testified that when Appellant
came through the door, he looked at Appellant=s face.  Defense counsel asked
Donald, AWould it be fair to say that from that point on [when Donald noticed
the gun], you [were] pretty well focused on that gun?@  Donald responded, ANo, I wasn=t staring at
the gun.  I knew it was there, but I wasn=t staring at it.@

When the State asked him
whether Appellant=s face was a
face he would ever forget, Donald replied, Ano,@ even though
he estimated that Appellant was only in his house for ten to twenty
seconds.  When asked whether he was able
to identify the man who robbed him in a photo lineup, Donald testified that he
had done so the day after the robbery and that he knew when he saw Appellant=s photo Athat he was
the man that robbed me.@

With regard to Appellant=s contention that Donald=s in‑court identification was also based upon the impermissibly
suggestive photo lineup, the State asked Donald about what position the person
he identified was in on the photo lineup. 
Donald replied, ANumber five,
the 5th picture.@  The State then asked, A[A]re you going from your memory or have you seen a photo lineup
recently?@  Donald said, AYes, I saw it earlier today.@  It is unclear whether the
question actually pertains to Donald=s identification of Appellant or to Donald=s memory of what position Appellant=s photograph occupied in the photo lineup.

We conclude that Donald=s in‑court identification of Appellant was sufficiently reliable
based on his observation of the accused during the offense: 








(1) he testified that he saw Appellant at his
house, looked at Appellant=s face, and observed his height and body size; (2) he knew Appellant
had the gun and responded to Appellant=s demand by handing him the van keys; (3) he was able to identify
Appellant the next day from a photo lineup and testified at trial about details
like Appellant=s attire the
night of the robbery; (4) he testified that he would never forget Appellant=s face; and 5) it was approximately two years between the van robbery
and the trial.[11]  Id. 
We overrule the remainder of Appellant=s fourth issue.

FACTUAL SUFFICIENCY

In his third issue, Appellant
complains that the evidence was factually insufficient.

Standard Of Review








When reviewing the factual
sufficiency of the evidence to support a conviction, we view all the evidence
in a neutral light, favoring neither party. 
Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); Drichas
v. State, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005).  We then ask whether the evidence supporting
the conviction, although legally sufficient, is nevertheless so weak that the
fact‑finder=s
determination is clearly wrong and manifestly unjust or whether conflicting
evidence so greatly outweighs the evidence supporting the conviction that the
fact‑finder=s
determination is manifestly unjust.  Watson,
204 S.W.3d at 414‑15, 417; Johnson v. State, 23 S.W.3d 1, 11 (Tex.
Crim. App. 2000).  To reverse under the
second ground, we must determine, with some objective basis in the record, that
the great weight and preponderance of all the evidence, though legally
sufficient, contradicts the verdict.  Watson, 204 S.W.3d at 417.








In determining whether the
evidence is factually insufficient to support a conviction that is nevertheless
supported by legally sufficient evidence, it is not enough that this court Aharbor a subjective level of reasonable doubt to overturn [the]
conviction.@  Id. 
We cannot conclude that a conviction is clearly wrong or manifestly
unjust simply because we would have decided differently than the jury or because
we disagree with the jury=s resolution
of a conflict in the evidence.  Id.  We may not simply substitute our judgment for
the fact‑finder=s.  Johnson, 23 S.W.3d at 12; Cain v.
State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  Unless the record clearly reveals that a
different result is appropriate, we must defer to the jury=s determination of the weight to be given contradictory testimonial evidence
because resolution of the conflict Aoften turns on an evaluation of credibility and demeanor, and those
jurors were in attendance when the testimony was delivered.@  Johnson, 23 S.W.3d at
8.  Thus, we must give due deference to
the fact‑finder=s
determinations, Aparticularly
those determinations concerning the weight and credibility of the evidence.@  Id. at 9.

 

 

Evidence At Trial

The jury convicted Appellant
of aggravated robbery, a robbery committed with the use or exhibit of a deadly
weapon.  See Tex. Penal Code Ann. ' 29.03(a)(2).[12]  Jaime testified that he and Angel worked for
Rene=s construction company, AT.C. Square[d].@  In August 2004, he and Angel spent four days
at a job site in a residential area, repairing a concrete curb.  On August 12, he and Angel started work on
the curb around 7:30 a.m.  The work
involved excavating the old concrete and Jaime was face down in the gutter
when, around 8:20 a.m., he heard someone order Angel to lay on the ground and
then saw four black men in their twenties. 
Jaime testified that one of the men had a rifle to Angel=s head.  Another of the four
noticed Jaime, ran over to him, pulled a black, revolver-type gun from his
pocket, and pointed it down at Jaime.








Jaime identified Appellant
from a photo lineup shown to him later the same day as the man who held the gun
on him.[13]  He testified that the man with the gun on him
demanded his money and made him take off his necklace and ring, empty his
pockets, and give everything to him, including his Sprint card.  One of the other men found Jaime=s wallet in Jaime=s toolbox and handed it to Appellant, who put it in his pocket with
Jaime=s Sprint card.  Jaime testified
that his wallet contained some credit cards, a two-dollar bill, and some
Mexican money.








Jaime testified that the men
also took equipment from the bed of his work truck: a generator, a shop saw, a
skill saw, and a transit level, and put some of the equipment into the back of
a black or dark blue Lincoln and put the generator into the car=s trunk.  Jaime described the
Lincoln as having two orange stickers, one on the front windshield and one on
the driver=s side
window, and that the stickers were the kind used by the city to have a car
removed.  He testified that when the men
left, he got up right away to see if he could write down their license plate,
but that it was covered with a white shirt, and then he ran to one of the
neighboring houses to call 911.  He
testified that a detective came out to the job site twice that day and that he
got his necklace back that day.

Rene testified that Jaime
called him around eight a.m. and told him that they had been robbed.  Rene was on his way to a pawn shop to look
for a wrench for one of his other workers; he arrived at the pawn shop around 9
or 10 a.m. and saw his generator and some of his other equipment being unloaded
from a long dark blue car by four young black men.  He testified that he knew that it was his
generator because it bore one of his oval stickers with Aa big T and a C and a little 2 above it@ that he puts on his equipment and he went into the pawn shop to
double check.  He went back to his truck
and flagged down a nearby police officer, Officer Brotherton, who pulled his
squad car behind Appellant=s car and asked Rene to wait outside. 
Rene testified that he got his equipment back, got Jaime=s necklace back for him, and got a good look at all four men inside
the pawn shop.  He testified that he did
not see Appellant take equipment out of the car, but that he did see Appellant
take it into the pawnshop because Appellant was the one who helped carry in the
generator.








Juan, who worked at A-1 Pawn,
testified that on August 12, one of the four young black men who walked into
the store asked him to step outside and take a look at some of the items he had
in the back of his car.  Juan testified
that the items, mostly power tools including a generator, a demolition saw, and
a laser level sight, were located in the trunk of a dark blue Lincoln and that
he overheard the four men discussing how they were going to split the
money.  He testified that the man who
asked him outside was wearing dark clothingCa black shirt and either black pants or shortsCand had a gold chain around his neck with an anchor with a missing
stone,[14]
which the man also wanted to sell or pawn.

Juan testified that they had
reached an agreement for the pawn shop to pay the men $350 for the equipment
when one of the other pawn shop employees, a member of a citizens= patrol group called Code Blue, alerted him that some of the
merchandise might be stolen.  He
testified that he was trying to explain to the men that the pawn shop would
have to pass after all when the police officer arrived.  State=s Exhibit 16, the pawn shop security camera videotape from August 12,
was admitted into evidence and published to the jury.








State=s Exhibit 17, the same photo lineup that was shown to Jaime, was also
shown to Juan.  He picked out two of the
four men: the man with the necklace and a man with him.  Juan testified that the man with the necklace
was photograph #5CAppellant.  After Detective Johnson, the lead detective
in this case, testified that he showed the photo lineup to Juan, it was
admitted into evidence and published to the jury.

Officer Brotherton testified
that, around 8:58 a.m., he received a broadcast about a robbery involving a
navy blue Lincoln Towncar.  He testified
that about the same time he noticed the car at the pawn shop, Rene flagged him
down.  He testified that when he went
into the pawn shop, everyone identified themselves correctly except for
Appellant; Appellant=s true
identity was determined after he was transported to records for a fingerprint
ID.  He testified that Appellant and
Brandon Nunley were arrested at the scene and that a Sprint card was found on
Appellant.  He testified that he searched
the Towncar but that he did not find any weapons.








Detective Johnson testified
that he and Detective Reyes went to Jaime and Angel=s job site and spoke with them around 9:00 or 9:30 a.m.  He testified that a couple of hours later, he
received a phone call directing his attention to the A-1 Pawn shop, which he
estimated was approximately eight to ten miles from Jaime=s job site.  He testified that
he also searched the Lincoln and did not find any weapons, but did find a
letter with Appellant=s name on it
and some Mexican money under the front passenger=s seat.[15]

Jaime was unable to identify
Appellant in court.  Rene testified that
Appellant=s appearance
had changed a little when he identified him in court, specifically, that
Appellant looked cleaner now, a little older, and that his hair might have been
a little longer in 2002.  Detective
Johnson, who investigated the aggravated robbery, also testified that Appellant=s appearance had changed when he identified Appellant in court.  Specifically, Detective Johnson stated that
in 2002, Appellant had braids that were combed back and was unshaven, and that
now it appeared that Appellant had put on some weight.  Appellant=s sole witness, his cousin, Willie Starlling, testified that Appellant
had braids in August 2002 but no longer had them, and that he was pretty sure
that Appellant had put on weight since the last time he had seen him.








Willie testified that
Appellant spent the night at Willie=s sister=s house with
Willie and that Appellant had loaned his car, a Lincoln Towncar, to someone
that Willie did not know on the day before Appellant was arrested. Willie
testified that he woke up around 9 a.m. on the day of the robbery and the next
time he saw Appellant=s car was
around 9:30 a.m. when two men brought it back and they all went to the pawn
shop.  He testified that he rode in the
back seat, where he was Akind of like
squashed up inside@ because of
the shop tools in the car, and that Appellant rode in the front passenger seat.

Willie testified that when
they arrived at the pawn shop, he went inside to look for video games and that
he had nothing to do with possession of stolen property.  He also testified about his various criminal
convictions, including drug possession and burglary and that he had a bad
memory.

Misidentification

Appellant complains that the
evidence was factually insufficient because Jaime could not identify him at
trial as one of the robbers and contends that that A[a] rational juror would reject the photo identification precisely
because it was so result‑oriented.@  We have already addressed
Jaime=s identification of Appellant from the photo lineup and determined
that it was not inherently unreliable.








The jury heard Jaime testify
that he identified the man who held the gun on him from the photo lineup as
photograph #5, only a few hours after the robbery.  Detective Johnson testified that Appellant=s photograph was photograph #5 in the photo lineup that he showed to
Jaime.  Exhibit 10, the photo lineup with
Jaime=s initials under Appellant=s photograph, was admitted into evidence and published to the
jury.  When showed Exhibit 10 and asked
if he saw anyone he recognized, Willie testified, AHe looked a little familiar.  I
don=t know just exactly.@  Willie testified that he and
Appellant did not stop and rob anyone on the way to the pawn shop.








The jury had the
responsibility to resolve the conflict in the evidence between Willie=s testimony that he and Appellant did not rob anyone and were still at
Willie=s sister=s house an
hour after the robbery occurred and Jaime=s testimony that man in photograph #5, Appellant, was the man who held
the gun on him.  See Johnson, 23
S.W.3d at 12; Cain, 958 S.W.2d at 407. 
Viewing the evidence in a neutral light, and giving due deference to the
jury=s determination of the weight to be given contradictory testimonial
evidence, we cannot say that this evidence is so weak that the jury=s determination is clearly wrong and manifestly unjust or that Willie=s conflicting evidence so greatly outweighs the evidence supporting
the conviction that the jury=s determination is manifestly unjust. 
See Watson, 204 S.W.3d at 414‑15, 417; Johnson, 23
S.W.3d at 8-9.  We overrule this portion
of Appellant=s third
issue.

Robbery

Appellant claims that, to the
extent there was evidence suggesting that he was fencing the stolen property,
it does not follow that Appellant participated in the robbery itself or even
knew where the stolen property came from. 
He contends that Willie=s testimony made it impossible for either Willie or Appellant to have
participated in the offense.








As discussed above, the jury
had the duty to resolve contradictory testimonial evidence and to determine
what weight to give that evidence based on the jury=s evaluation of the credibility and demeanor of the witnesses, here,
to evaluate Willie=s testimony
that he and Appellant did not rob anyone against testimony by Jaime about the
theft itself, and the testimony by Rene, Juan, Officer Brotherton, and
Detective Johnson about the events in the pawn shop and in the subsequent
investigation.  See Johnson, 23
S.W.3d at 8.  Viewing the evidence in a
neutral light, and giving due deference to the jury=s determinations, we also cannot say here that the evidence supporting
the conviction is so weak that the jury=s determination is clearly wrong and manifestly unjust, or that the
conflicting evidence so greatly outweighs the evidence supporting the
conviction that the jury=s
determination is manifestly unjust.  See
Watson, 204 S.W.3d at 414-15, 417; Johnson, 23 S.W.3d at 11.  We overrule the remainder of Appellant=s third issue.

LESSER‑INCLUDED OFFENSE

In his first issue, Appellant
complains that the trial court erred by not instructing the jury on the lesser‑included
offense of theft, claiming that there was evidence suggesting that he attempted
to fence the stolen property and that there was evidence negating any
participation by him in the armed robbery. 

 

Standard Of Review








We use a two‑step
analysis to determine whether an appellant was entitled to a lesser-included
offense instruction.  Hall v. State,
225 S.W.3d 524, 528 (Tex. Crim. App. 2007); Rousseau v. State, 855
S.W.2d 666, 672‑73 (Tex. Crim. App.), cert. denied, 510 U.S. 919
(1993).  First, the lesser offense must
come within article 37.09 of the code of criminal procedure.  Tex.
Code Crim. Proc. Ann. art. 37.09 (Vernon 1981); Moore v. State,
969 S.W.2d 4, 8 (Tex. Crim. App. 1998).  AAn offense is a lesser-included offense if . . . it is established by
proof of the same or less than all the facts required to establish the
commission of the offense charged.@  Tex. Code Crim. Proc. Ann. art. 37.09(1); Hall, 225
S.W.3d at 536.  This inquiry is a
question of law.  Hall, 225 S.W.3d
at 535.  It does not depend on the
evidence to be produced at the trial but is performed by comparing the elements
of the offense as they are alleged in the indictment or information with the
elements of the potential lesser-included offense.  Id. at 525, 535-36.








Second, some evidence must
exist in the record that would permit a jury to rationally find that if the
appellant is guilty, he is guilty only of the lesser offense.  Id.; Salinas v. State, 163
S.W.3d 734, 741 (Tex. Crim. App. 2005); Rousseau, 855 S.W.2d at 672‑73.  The evidence must be evaluated in the context
of the entire record.  Moore, 969
S.W.2d at 8.  There must be some evidence
from which a rational jury could acquit the appellant of the greater offense
while convicting him of the lesser-included offense.  Id. 
The court may not consider whether the evidence is credible,
controverted, or in conflict with other evidence.  Id. 
Anything more than a scintilla of evidence may be sufficient to entitle
a defendant to a lesser charge.  Hall,
225 S.W.3d at 536.  The second prong acknowledges
that there are factual circumstances in which an offense is indeed a
lesser-included offense under the first prong, but a jury charge instruction
will not be required because the conditionCthat the defendant is not guilty of the greater offense but is guilty
of the lesserCis not
met.  Pickens v. State, 165 S.W.3d
675, 679 (Tex. Crim. App. 2005); see also Irving v. State, 176 S.W.3d
842, 845‑46 (Tex. Crim. App. 2005); Hayward v. State, 158 S.W.3d
476, 478 (Tex. Crim. App. 2005).  In such
a case, the offense remains a lesser-included offense, but the trial court is
not required to instruct the jury on it. 
Pickens, 165 S.W.3d at 679. 

Theft Instruction

Appellant was indicted of
having Aintentionally or knowingly, while in the course of committing theft
of property and with intent to obtain or maintain control of said property,
threaten[ed] or place[d] Jaime Hernandez in fear of imminent bodily injury or
death, and . . . used or exhibited a deadly weapon, to‑wit: firearm.@ [Emphasis added.]  Theft is the
unlawful appropriation of property with intent to deprive the owner
thereof.  See Tex. Penal Code Ann. ' 31.03(a).  Appropriation of
property is unlawful when it is without the owner=s effective consent or the property is stolen and the actor
appropriates it knowing that it was stolen by another.  See id. ' 31.03(b)(1), (2).  Appellant=s argument meets the first step of the analysis.  See Hall, 225 S.W.3d at 525, 535‑36.








As to the second step of the
analysis, that there must be some evidence in the record that would permit the
jury to rationally find that Appellant was guilty only of theft.  A charge on the lesser-included offense is
not required when the defendant presents no evidence or presents evidence that
no offense was committed and there is no evidence otherwise showing that the
defendant is guilty of a lesser-included offense.  Lofton v. State, 45 S.W.3d 649, 652
(Tex. Crim. App. 2001).

Appellant contends that Juan=s testimony suggests that he was only attempting to sell stolen
property at the pawn shop and that Willie=s testimony negated Appellant=s participation in the armed robbery and established that the pawn
shop participants could have been oblivious to the fact that the property was
procured at the robbery earlier the same morning.  He argues that no weapons were used or
exhibited at the pawn shop and that the indictment was written broadly enough
to encompass what occurred at the job site and at the pawn shop.  He claims that, absent an election by the
State, he was entitled to a charge on the lesser‑included offense because
there was a negation of armed robbery and some evidence suggesting that he was
guilty only of fencing the stolen property.








The only evidence that
Appellant appropriated the property without the owner=s effective consent is Jaime=s testimony that Appellant demanded his property at gunpoint; there is
no evidence in the record to establish that Appellant appropriated the property
without participating in the robbery with knowledge that it was stolen by
another.  See Tex. Penal Code Ann. ' 31.03(b)(1), (2).  If the jury
believed Willie=s testimony,
then Appellant did not participate in the robbery.  Nothing in Willie=s testimony or Juan=s testimony establishes that, if Appellant only went to the pawn shop
and did not rob anyone, that Appellant knew that the property in the Lincoln
was stolen.  Juan testified that he
was alerted by one of the other pawn shop employees that the property in the
Lincoln could have been stolen, but this does not establish that, if Appellant
did not participate in the robbery, Appellant knew the property had been stolen.  Willie testified only that he and Appellant
went to the pawn shop the next day with two other men, that the property was in
the Lincoln, and that he did not know what was going on when the police arrived
at the pawn shop. He testified that he could not remember what Appellant did at
the pawn shop when they arrived because he went inside to look at video games.[16]  Therefore, because there is no evidence to
show that Appellant was guilty only of theft, he was not entitled to a
lesser-included offense instruction.  See
Lofton, 45 S.W.3d at 652.  We
overrule Appellant=s first
issue.

HEARSAY








In his fifth issue, Appellant
complains that the drug analyst‑supervisor should not have been allowed
to testify in the punishment phase that the substances removed from the car
that Appellant was driving were marijuana and cocaine.  We review the admission of evidence under an
abuse of discretion standard.  See
Wyatt v. State, 23 S.W.3d 18, 29 (Tex. Crim. App. 2000).

Supervisor Testimony

At trial, Aracelli Uptmor,
drug analyst for the Waco crime lab, testified about her educational
background, that she had previously testified in state district court as an
expert in the area of drug analysis on many occasions, and that she had been
the drug section supervisor for two and a half years.  She also testified that drug analyst Scott
Vajdos, one of her subordinates who no longer worked for the crime lab, had
performed the analysis on the substances given to the lab by the Grandview
Police Department.[17]  She explained how a drug analysis of marijuana
and unknown substances would be conducted, that Vajdos performed those tests on
the substances, and testified that she had reviewed Vajdos= work and the data he had in connection with the analyses he performed
on the substances.  She gave her opinion,
based on what she had reviewed and the data Vajdos collected, that Exhibit 27
was marijuana and Exhibit 28 was cocaine.













Appellant contends that the
admission of Uptmor=s testimony
violated rule 803(8)(B) under Cole v. State, 839 S.W.2d 798 (Tex. Crim.
App. 1990), a case in which the court concluded that crime lab reports failed
to satisfy rule 803(8)(B)=s
requirements.[18]  See 839 S.W.2d at 805.  However, here, the State did not seek to
admit Vajdos= reports
into evidence.  The court of criminal
appeals has addressed the issue of whether the testimony of an expert who bases
her opinion on a report that has been prepared by one of the expert=s subordinates is hearsay and has concluded, on facts like the case
before us, that it is not.  See
Martinez v. State, 22 S.W.3d 504, 507‑08 (Tex. Crim. App. 2000).  In Martinez, the court of criminal
appeals held that the present opinion of a testifying witness does not
constitute hearsay because it is not, and can never be, a statement other than
one made by the declarant testifying at trial. 
Id. at 508 (citing Aguilar v. State, 887 S.W.2d 27, 29
(Tex. Crim. App. 1994)).  The Martinez
court distinguished Cole, restating the Aguilar plurality=s conclusion that the dispositive issue was whether the absent witness=s report itself was ever actually offered or admitted into evidence over
the appellant=s objection
as the basis for its holding that the expert=s opinion was not hearsay.  Id.

Since the trial court
implicitly found Uptmor qualified as an expert, the State had no burden to
invoke an exception to the hearsay rule. 
See id. at 508.  The trial
court properly admitted Uptmor=s expert testimony that the substances were cocaine and marijuana
because it was not hearsay and was not required to be based on her personal
knowledge.[19]  See id.  For these reasons, we hold that the trial
court did not abuse its discretion by admitting Uptmor=s testimony. Accordingly, we overrule Appellant=s final issue.

CONCLUSION

Having overruled all of
Appellant=s issues, we
affirm the judgment of the trial court.








PER CURIAM

 

PANEL F: 
HOLMAN, LIVINGSTON, and DAUPHINOT, JJ.

DO
NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  August 24, 2007

 











[1]See Tex. R.
App. P. 47.4.





[2]See Tex.
Penal Code Ann. ' 29.03(a)(2) (Vernon 2003).





[3]Jaime and Angel are not
related.  Angel gave similar testimony
about the day=s events through an interpreter.





[4]These factors include: (1) the
opportunity of the witness to view the criminal at the time of the crime, (2)
the witness=s degree of attention, (3) the
accuracy of the witness=s prior description of the
criminal, (4) the level of certainty demonstrated by the witness at the
confrontation, and (5) the length of time between the crime and the
confrontation.  Biggers, 409 U.S.
at 199-200, 93 S. Ct. at 382.





[5]While neither party moved for
written findings of fact and conclusions of law, and none were filed, it is
apparent from the record that the trial court intended for its findings and
conclusions to be expressed via its oral pronouncements.  In reviewing a motion to suppress, oral
findings of fact can be considered as findings of fact on the record and given
due deference.  See, e.g., Flores v.
State, 177 S.W.3d 8, 13 (Tex. App.CHouston [1st Dist.] 2005, pet. ref=d) (reviewing trial court=s oral findings of fact on a motion
to suppress), cert. denied, 126 S. Ct. 2298 (2006).

The trial court=s findings of fact here are
supported by the record.  Jaime testified
that the detective told him that he was going to show Jaime some photos to see
if he recognized anyone and handed the photo lineup to him. Jaime testified
that he spent twenty to thirty seconds, or possibly thirty to forty seconds,
looking at the lineup before picking out photo #5, Appellant, and initialing
it.  He testified, AIt didn=t take me too long to pick up that
individual who I had picked.@  He identified
Exhibit 10 as the photo lineup that he initialed. Jaime testified that the
detective did not suggest to him that there might be several people in the
photo spread that were part of the robbery, only that Ahe was going to show it to [Jaime]
and see if [he] was able to recognize somebody from there.@ 
Jaime testified that he was shown the photo lineup on the same day as
the robbery, about five or six hours later.

 

Jaime testified that
after he selected photo #5, the detective asked if that was the only one.  Jaime said that he told the detective that
that was the only one close to him, that he did not pay attention to the
others, and that he did not know that the detective meant that there might be
someone else in the photo lineup that had committed the robbery.





[6]Jaime requested that questions be
repeated more than once.  The trial court
repeated questions to him and instructed him to listen to the questions several
times.  At one point, defense counsel
even stated, AYou might not be understanding my
questions@ before repeating the questions
again.





[7]We note that even if the detective
had made such a suggestion, it would be only one factor to consider in
determining whether the photo lineup was impermissibly suggestive; it would not
be conclusive.  See Barley, 906
S.W.2d at 33 (holding analysis requires examination of the totality of
surrounding circumstances); see also Simmons 390 U.S. at 383, 88 S. Ct.
at 971 (noting chance of misidentification is heightened if police indicate one
of the persons pictured committed the crime).





[8]Before the jury, he elaborated that
he felt that Appellant was dropped off and that the Towncar Awas waiting for him to get the van
or show up, somehow, as to not leave him behind.@





[9]Donald testified that his own
height was around 5 feet 10 inches and that he weighed around 145 pounds at the
time.  Donald later described the man as
wearing a Ado-rag@ and some kind of jersey.





[10]Before the jury, Donald testified
that he did not remember the exact words the detective used when he presented
the photo lineups, but that the detective did not say Athe person that we caught is in
here@ or give him the impression that he
was supposed to pick one.  Donald
testified that he knew that the people that had done this had been caught but
that he had the impression that the person who robbed him would be in the photo
lineups Adue to [his] own thoughts@ that it was unnecessary for the
detective Ato bring pictures of people that
weren=t suspected of doing this crime.@ 
Donald testified that the detective told him that he had suspects under
arrest for a different offense, not for the van robbery.





[11]Additionally, the trial court
instructed the jury in its charge on punishment that they could not consider
testimony about extraneous offenses unless they found and believed beyond a
reasonable doubt that Appellant committed such other offenses.





[12]Robbery is a theft committed while
intentionally or knowingly threatening or placing another in fear of imminent
bodily injury or death.  See id.





[13]Jaime testified that he saw the
photo lineup around 3:30 that afternoon. 





[14]Jaime described his stolen necklace
as A34 inches long . . . [with] an
anchor with a cross on the center and three stones, three blue stones and it
was missing one beside it.@  State=s Exhibit 1, a photograph of the
necklace, was admitted into evidence. 
Rene testified that he recognized State=s Exhibit 1 as a photograph of
Jaime=s necklace.





[15]There was also testimony about a
potential police error with regard to an AErrick@ Washington, who was one of the four men at the pawn shop.
Defense counsel suggested to Detective Johnson that it might have been ADerrick@ Washington instead, to which he
replied, AI don=t know.  I was never able to locate a photograph of
Errick Washington or a record of him.@  He added, AToday is the first I have []ever
heard of Derrick Washington.@  Defense counsel
brought Jerry Rucker, the records custodian of the Tarrant County Sheriff=s Office, to lay foundation for two
photographs of Derrick Washington, admitted into evidence and published to the
jury.





[16]Willie agreed when the State asked
him if his testimony was, Ayou got into [Appellant=s] car with two guys you didn=t know and some things that you don=t know what they were or where they
came from and you didn=t have any part in selling at the
pawn shop.@





[17]Sergeant Ruben Rivas, formerly of
the Grandview Police Department, testified that he made a traffic stop of
Appellant and discovered what appeared to be marijuana and cocaine in the car
Appellant was driving.





[18]Rule 803(8)(B) provides that the
unavailability of a declarant as a witness is immaterial for records, reports,
statements, or data compilations of public offices or agencies setting forth
matters observed pursuant to duty imposed by law as to which matters there was
a duty to report, but excluding in criminal cases matters observed by police
officers and other law enforcement personnel. 
See Tex. R. Evid. 803(8)(B).  Items that meet rule 803(8)(B) are not
hearsay unless the sources of information or other circumstances indicate lack
of trustworthiness.  See id.





[19]Uptmor did testify about the weight
of the cocaine and marijuana from the report, but Appellant does not
specifically contend that it was error for the trial court to admit this
information.  And even if Uptmor=s testimony did improperly reveal
underlying facts or data that were inadmissibleCfor which rule 705(d) would require
the trial court to give a limiting instruction upon requestCno limiting instruction was
requested.  See Tex. R. Evid. 705(d) (stating that when
the underlying facts or data of an expert opinion would be inadmissible in
evidence, the court shall exclude the underlying facts or data if the danger
that they will be used for a purpose other than as explanation or support for
the expert=s opinion outweighs their value as
explanation or support or are unfairly prejudicial.  If otherwise inadmissible facts or data are
disclosed before the jury, a limiting instruction by the court shall be given
upon request).